**Leonard KAUFMAN, Plaintiff,**

v.

**Carol CARTER, et al., Defendants.**

**No. 1:95–CV–313.**

United States District Court,
W.D. Michigan,
Southern Division.

Dec. 9, 1996.

522

Daniel E. Manville, Daniel E. Manville, PC, Ann Arbor, MI, Michael J. Steinberg, Michael J. Steinberg Law Office, Ann Arbor, MI, for Leonard Kaufman.

Steven E. Burnham, Kalamazoo County Corporation Counsel, Kalamazoo, MI, for Carol Carter, Carol Waligursky, Thomas Edmonds and County of Kalamazoo.

## OPINION ADOPTING IN PART AND RE-JECTING IN PART MAGISTRATE JUDGE'S REPORT AND RECOM-MENDATION

HILLMAN, Senior District Judge.

Plaintiff Leonard Kaufman brings constitutional and statutory claims against defendants Carol Carter and Carol Waligursky, nurses employed in the Kalamazoo County Jail, in their individual capacities. Also named as defendants are Sheriff Thomas Edmonds, in his individual and official capacities, and Kalamazoo County. This court now reviews plaintiff's objections to the Magistrate Judge's Report and Recommendation ("R & R") which recommended summary judgment be granted to defendants on all counts.

### I. BACKGROUND

Plaintiff, a bilateral amputee, is missing his left leg from above the knee and his right leg from below the knee as a result of a 1974 train accident. He uses a wheelchair and, on occasion, walks with the aid of prostheses. As a parole violator awaiting trial on new charges, plaintiff was incarcerated in the Kalamazoo County Jail from June 19, 1992 until October 22, 1992. He now brings a claim under 42 U.S.C. § 1983, alleging that defendants were deliberately indifferent to his serious medical needs in violation of the Fourteenth Amendment, as interpreted under the standards of the Eighth Amendment. He also claims that the conditions of his confinement violated the Rehabilitation Act, 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12131–12134. He initially brought an additional claim under the Michigan Handicapper's Act, Mich.Comp.Laws §§ 37.1101 *et seq.*, but has waived his appeal as to the Magistrate Judge's recommendation to grant summary judgment on this claim.

First, plaintiff claims that the jail was deliberately indifferent to his serious medical needs in violation of the Fourteenth Amendment. During his confinement, plaintiff alleges, he requested rubbing alcohol so that he could clean his prosthetic limbs and "ace wraps" so that he could maintain the size of his leg stumps while not wearing his prostheses. He claims that these requests were refused. As a result, his stumps swelled and he was not able to use his prostheses. He asserts that he was confined to his wheelchair until March 31, 1995, when he was able to have new prostheses fitted.

Plaintiff also alleges that Sick Bay No. 3, the five-person cell where he was confined, violated the Rehabilitation Act and the ADA in a number of ways. He alleges that the shower was too narrow to accommodate his wheelchair. Also, because it lacked handrails and non-slip flooring materials, he faced great difficulty in transferring himself from his wheelchair to the shower bench. He claims that this arrangement caused him to fall at one point while attempting to use the shower. As a result, he was taken by ambulance to a local emergency room and diagnosed as having pulled a back muscle. Plaintiff further claims he was unable to maintain proper hygiene due to his difficulties with the shower, and was harassed by cellmates due to his odor. Plaintiff also asserts that the toilet in Sick Bay No. 3 was inaccessible to

him. He claims that it lacked both handrails and a seat, and was set into a narrow stall into which he could not maneuver his wheelchair. He claims that on occasion he either fell to the floor while attempting to transfer between his wheelchair and the toilet, or fell directly into the toilet water, which required his cellmates to pull him out of the bowl. These events, he asserts, left him bruised and humiliated. He claims that the cell's drinking fountain and sink were inaccessible to him, and that their design once caused him to fall while attempting to get a drink of water. He also claims that he could not reach the telephone without assistance from fellow inmates. Plaintiff alleges that he informed defendant nurses of each of these inadequacies, to no avail. He acknowledges that defendants installed a new bed in response to his complaints, but claims that it remained deficient in several respects.

Plaintiff seeks injunctive relief and money damages in response to these alleged violations of his rights.

Defendants moved alternatively to dismiss plaintiff's claims and for summary judgment. The magistrate judge recommended granting summary judgment to defendants on all of plaintiff's claims. Thereafter the magistrate judge granted leave for plaintiff to file his objections to the R & R out of time.

## II. *ANALYSIS*

### A. *Standard of Review*

This court reviews *de novo* those portions of the R & R to which objections are made. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b). The court may accept, reject, or modify any or all of the magistrate judge's findings or recommendations. *Id.*

### B. *Summary Judgment Standards*

Summary judgment facilitates the overall goals of the Federal Rules of Civil Procedure, which are "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). A motion for summary judgment will be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden is on the moving party to show that no genuine issues of material fact exist. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

Once the moving party presents a *prima facie* showing that he or she is entitled to judgment as a matter of law, the party opposing the motion may not rest upon the mere allegations or denials in its pleadings but must set forth specific facts showing that a genuine issue for trial exists. *Anderson,* 477 U.S. at 256–57, 106 S.Ct. at 2514–15. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and upon which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. However, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

### C. *Plaintiff's Deliberate Indifference Claim*

Plaintiff claims that the named defendants violated his Eighth and Fourteenth Amendment rights by their deliberate indifference to his serious medical needs. He alleges that defendants intentionally failed to provide him with the rubbing alcohol and wrapping materials needed to maintain the stumps of his amputated legs in a condition that would accept prostheses. As a result, he claims, he lost the ability to ambulate until new prostheses could be fitted to his enlarged stumps in 1995.

The magistrate judge noted that plaintiff admitted receiving some medical care from defendants, and concluded that plaintiff's deliberate indifference claim essentially concerns the adequacy of his treatment rather than whether his needs were ignored. The R & R also addressed the constitutional status of plaintiff's conditions of confinement. This claim was never directly raised by plain-

tiff, and the magistrate judge apparently addressed it in response to issues raised by defendants. Nevertheless, the magistrate judge recommended granting summary judgment for defendants on both claims, concluding that plaintiff's claims failed under either Eighth Amendment theory.

Plaintiff's objection to the R & R speaks only to the recommendation regarding whether the conditions of plaintiff's confinement were unconstitutional. As plaintiff did not plead in his complaint a claim regarding condition of confinement, I decline to address it at this time.

■ Because plaintiff made no objection to the magistrate judge's recommendation that defendants' motion for summary judgment be granted as to his deliberate indifference claim, he has effectively waived review of that claim. *See* 28 U.S.C. § 636(b)(1)(C); *United States v. Walters,* 638 F.2d 947, 949–50 (6th Cir.1981). However, this rule is procedural rather than jurisdictional. "[W]hile [§ 636(b)(1)(C) ] does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard." *Thomas v. Arn,* 474 U.S. 140, 154, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985). Because of the importance of this claim, this court will exercise its discretionary review over the magistrate judge's recommendation notwithstanding plaintiff's failure to properly preserve this claim.

■ The constitutional standards pertaining to the Eighth Amendment also govern the conditions of pretrial detention. A pretrial detainee is not, strictly speaking, undergoing punishment, as he or she has not been judged guilty of an offense. *See Danese v. Asman,* 875 F.2d 1239, 1242 (6th Cir.1989), *cert. denied,* 494 U.S. 1027, 110 S.Ct. 1473, 108 L.Ed.2d 610 (1990), citing *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1871, 60 L.Ed.2d 447 (1979). However, "[t]he eighth amendment rights of prisoners are analogized to those of detainees under the fourteenth amendment, to avoid the anomaly of extending greater constitutional protection to a convict than to one awaiting trial." *Rob-*

*erts v. City of Troy,* 773 F.2d 720, 723 (6th Cir.1985).

■ Under the Eighth Amendment, the government is required to "provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). Because of the prisoner's absolute dependance on prison officials, "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment." *Id.* at 104, 97 S.Ct. at 291 (citation omitted). "Serious medical needs" need not involve a risk of permanent physical injury: "[i]n less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* at 103, 97 S.Ct. at 290.

■ This indifference must be "deliberate," for "an inadvertent failure to provide adequate medical care [i.e.] a complaint that a physician has been negligent ... does not state a valid claim of medical mistreatment under the Eighth Amendment." *Id.* at 106, 97 S.Ct. at 292. This standard requires a plaintiff to show "that the [prison] official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan,* 511 U.S. 825, 841, 114 S.Ct. 1970, 1981, 128 L.Ed.2d 811 (1994). Such knowledge is, of course, "subject to demonstration in the usual ways, including inference from circumstantial evidence ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*

■ The Sixth Circuit, applying a Fourteenth Amendment "deliberate indifference" test, has held that "a prisoner states a proper cause of action when he alleges that prison authorities have denied reasonable requests for medical treatment in the face of an obvious need for such attention where the inmate is thereby exposed to undue suffering or a tangible residual injury." *Westlake v. Lucas,* 537 F.2d 857, 860 (6th Cir.1976). The *Westlake* court held that "a prisoner who is need-

lessly allowed to suffer pain when relief is readily available does have a cause of action against those whose deliberate indifference is the cause of his suffering." *Id.* The court also noted, however, the distinction "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Id.* at n. 5. In the latter cases, the court stated, "federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.* Still, the court cautioned, "in some cases the medical attention rendered may be so woefully inadequate as to amount to no treatment at all." *Id.*

Defendants respond to plaintiff's deliberate indifference claim in two ways. First, they contest his version of the facts. Defendants cite to the affidavits of Carter and Waligursky, which state that plaintiff was in fact provided with the supplies necessary to care for his stumps. Defendants also claim that jail records do not reflect complaints by plaintiff regarding the allegations in his complaint. However, plaintiff has properly supported this claim with an affidavit contradicting defendants' account. He states that the nurses largely ignored his repeated requests for the supplies necessary to maintain the size of his leg stumps and prevent the breakdown of their skin. Whether it is defendants' or plaintiff's version of events that is accurate is not something this court can evaluate on a motion for summary judgment. For the purposes of defendants' motion, the court must accept plaintiff's properly-supported factual assertions as true.

Second, the individual defendants assert that they are entitled to qualified immunity on this claim. Defendants assert that plaintiff's claim is best read as merely alleging inadequate care rather than actual deprivation of care, and that it therefore fails under *Westlake.*

"[T]he recognition of a qualified immunity defense for high executives reflect[s] an attempt to balance competing values: not only the importance of a damages remedy to protect the rights of citizens ... but also 'the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.'" *Harlow v. Fitzgerald,* 457 U.S. 800, 807, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982) (citations omitted). Accordingly, "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (citations omitted). However, the defense of qualified immunity fails where "[t]he contours of the right [are] sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right[;] in the light of pre-existing law the unlawfulness must be apparent." *Id.* at 640, 107 S.Ct. at 3039.

Accepting the statements made in plaintiff's affidavit as true, plaintiff has adequately alleged a claim of deliberate indifference under clearly established law. Although plaintiff's affidavit concedes that Carter and Waligursky responded occasionally to his requests for assistance, he states that the nurses for the most part refused to provide him with the supplies he needed. While an inadvertent failure to treat medical needs does not rise to the level of a constitutional violation, it is clear that the deprivation plaintiff alleges was intentional. Defendants' overall refusal to provide plaintiff with care was not cured by isolated, ineffectual instances of treatment. *Johnson v. Hardin County, Ky.,* 908 F.2d 1280, 1284 (6th Cir.1990) (holding that district court properly denied summary judgment on plaintiff's deliberate indifference claim where defendants, *inter alia,* frequently failed to provide plaintiff with all of his daily doses of pain medication); *Boretti v. Wiscomb,* 930 F.2d 1150, 1154 (6th Cir.1991) (holding that jail staff violated the Eighth Amendment by failing to carry out a medical "plan [and by] failing to change the dressing on [plaintiff's] wound daily"). Such intentional neglect is properly considered to be deliberate indifference.

■ For plaintiff to prevail on this claim, he must prove not only that defendants were deliberately indifferent to his medical needs, but also that those needs were in fact "serious." Plaintiff has put forward evidence in his affidavit that defendants refused to provide him with the elementary supplies that he needed, and that this prevented him from maintaining the stumps of his amputated legs in a condition which would allow them to accept prostheses. As a result, he states, he lost the ability to walk and was forced to use a wheelchair until March 31, 1995, when he was able to obtain new prostheses to fit his enlarged stumps. A medical condition that threatens one's ability to walk, even if ultimately reversible, is unquestionably a serious matter. The fact that this injury eventually healed does not invalidate his claim. *Boretti v. Wiscomb*, 930 F.2d 1150, 1155 (6th Cir. 1991) (holding that "the fact that ... plaintiff's wound did not become infected and healed is not a bar to recovery" under a deliberate indifference theory). If such a medical need was deliberately disregarded by the nurses at the Kalamazoo County Jail, plaintiff is entitled to recover for the resulting harm he sustained.

■ Although plaintiff has stated facts which, if proved, constitute a violation by defendants Carter and Waligursky of his Fourteenth Amendment right to medical care, he has put forward no evidence that would directly implicate either Sheriff Edmonds or Kalamazoo County in this alleged violation. A claim of "deliberate indifference" requires a showing, at minimum, "that a prison official ... failed to act believing that harm actually would befall an inmate." *Farmer*, 511 U.S. at 840–41, 114 S.Ct. at 1981. Plaintiff must therefore put forward some evidence that these defendants had this requisite mental state. He has not done so. Plaintiff's affidavits evidence only that nurses Carter and Waligursky were aware of his medical needs. He has presented no evidence from which a court or jury could conclude that the nurses' superiors knew of and disregarded these violations. Accordingly, defendants' summary judgment motion will be granted as to plaintiff's deliberate indifference claim against Sheriff Edmonds and

Kalamazoo County, and denied as to defendants Carter and Waligursky.

## D. Plaintiff's Claims Under the Rehabilitation Act and the Americans with Disabilities Act

Plaintiff further claims that his accommodations at the Kalamazoo County Jail violated both the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134.

Although defendants' briefs assumed that these Acts are applicable to state prisons, the magistrate judge *sua sponte* raised this threshold issue. Relying principally on a recent Fourth Circuit case, *Torcasio v. Murray*, 57 F.3d 1340 (4th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 772, 133 L.Ed.2d 724 (1996), the magistrate judge recommended that neither Act be held applicable to plaintiff's claim. As a further ground for denying relief, the magistrate judge concluded that even were plaintiff's complaint to have stated a claim, the officials in question would have been entitled to qualified immunity because the applicability of these statutes to prisons is not "clearly established."

### 1. Applicability of Rehabilitation Act and Title II to Prisons

### a. The Rehabilitation Act

■ The first question to be addressed is whether the Rehabilitation Act does or does not apply to Michigan prisons. The Rehabilitation Act was enacted with the purpose of extending to the disabled "the guarantee of equal opportunity ..." 29 U.S.C. § 701(b)(1)(f). The Act provides broadly that its mandate extends to "*any* program or activity receiving Federal financial assistance ..." 29 U.S.C. § 794 (emphasis added). "In determining the meaning of legislation, we must first look to the plain language of the statute itself." *Bradley v. Austin*, 841 F.2d 1288, 1293 (6th Cir.1988). It is not disputed that the Michigan Department of Corrections receives federal financial assistance. Likewise, being a "program or activity," it would appear to be subject to the

Rehabilitation Act by the Act's literal language.

■ In addition, administrative regulations promulgated pursuant to the Act by the DOJ confirm this reading. "[R]egulations ... interpret[ing a] statute by the agencies charged with its enforcement ... should not [be] reject[ed] ... absent clear inconsistency with the face or structure of the statute, or with the unmistakable mandate of the legislative history." *Guardians Ass'n v. Civil Service Comm'n of the City of New York,* 463 U.S. 582, 592, 103 S.Ct. 3221, 3227, 77 L.Ed.2d 866 (1983). The federal interpretive regulation detailing what is included by the Act's reference to government "program[s]" explains that, [t]he term *program* means the operations of the agency or organizational unit of government receiving or substantially benefiting from the Federal assistance awarded, e.g., a police department or *department of corrections.* 28 C.F.R. § 42.540(h) (1995) (emphasis added).

Furthermore, numerous courts have concluded that the Rehabilitation Act applies to state prisons. *See Duffy v. Riveland,* 98 F.3d 447, 453 (9th Cir.1996); *Lue v. Moore,* 43 F.3d 1203, 1205 (8th Cir.1994); *Gates v. Rowland,* 39 F.3d 1439, 1446 (9th Cir.1994); *Harris v. Thigpen,* 941 F.2d 1495 (11th Cir. 1991); *Bonner v. Lewis,* 857 F.2d 559, 562 (9th Cir.1988); *Journey v. Vitek,* 685 F.2d 239, 242 (8th Cir.1982); *Niece v. Fitzner,* 941 F.Supp. 1497, 1511 (E.D.Mich.1996); *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1036 (S.D.N.Y.1995); *Austin v. Pennsylvania Dep't of Corrections,* 876 F.Supp. 1437, 1465 n. 17 (E.D.Pa.1995); *Donnell C. v. Illinois State Bd. of Educ.,* 829 F.Supp. 1016, 1020 (N.D.Ill.1993); *Sites v. McKenzie,* 423 F.Supp. 1190, 1197 (N.D.W.Va.1976). Plaintiff correctly points out that the Ninth Circuit has reaffirmed its prior holding in *Bonner* that the Rehabilitation Act applies to state prisons. *See Duffy,* 98 F.3d at 453; *Gates,* 39 F.3d at 1446.

The few federal cases that have held the Rehabilitation Act inapplicable to corrections institutions are unpersuasive. The Tenth Circuit has held, without further explanation, that "[t]he section of the Rehabilitation Act cited by plaintiff, 29 U.S.C. § 794, does not give plaintiff any substantive rights since the Federal Bureau of Prisons does not fit the definition of 'programs or activities' governed by that section." *Williams v. Meese,* 926 F.2d 994, 997 (10th Cir.1991). Not only is this holding so cursory as to be of little persuasive value, but what reasoning it does provide is suspect. It is a doubtful conclusion that federal prisons do not come within the Act's reference to "program[s] ... conducted by any Executive agency ..." 29 U.S.C. § 794. In any event, because *Williams* pertains to federal, rather than state, prisons, it is inapplicable.

*Torcasio,* 57 F.3d 1340, is equally unconvincing. There, the Fourth Circuit held, *inter alia,* that it was not "clearly established" that the Rehabilitation Act applied to state prisons. *Id.* at 1346. The principal reason cited by the *Torcasio* court for its holding was that "management of state prisons is a core function of the state sovereign, and is not presumptively subject to federal control ..." *Id.* at 1345. In the court's view, Congress must specifically negate this presumption in order for states to be bound by legislation that is phrased in expansive terms. Accordingly, the court stated that it would ignore the "broad, non-specific language contained in ... isolated portions of the acts" because "Congress must speak unequivocally before we will conclude that it has 'clearly' subjected state prisons to its enactments." *Id.* at 1346.

This reasoning is not persuasive. Congress did in fact unequivocally state its intent to subject state governments to the Rehabilitation Act by abrogating the states' sovereign immunity under the Act. *See* 42 U.S.C. § 2000d–7. Considering this decision by Congress, and the statute's broad, unqualified language referring to "any" program or activity receiving federal financing, I am convinced that Congress indeed meant just what it said. "Any program" could not be clearer. To hold otherwise would be tantamount to requiring Congress to specify each and every one of the governmental units that it contemplates when it enacts any statute that is generally applicable to the states.

A recent Indiana district court decision raises a concern already put to rest by the

Ninth Circuit. *Crawford v. Indiana Dep't of Correction*, 937 F.Supp. 785, 791 (N.D.Ind. 1996). The district court held that Rehabilitation Act rights are suspended during incarceration, reasoning that "it strains common sense to subject a prisoner's ... Rehabilitation Act claim[ ] to a more stringent review than his constitutional claims." *Id.* The Ninth Circuit has commented upon this very issue, stating that "[i]t is highly doubtful that Congress intended a more stringent application of the prisoners' statutory rights created by the Act than it would the prisoners' constitutional rights." *Gates*, 39 F.3d at 1447. The *Gates* court did not conclude that the Act is inapplicable to prisons. Instead it held that review under the Rehabilitation Act should be "equivalent to the review of constitutional rights in a prison setting, as outlined by the Supreme Court in *Turner v. Safley*, 482 U.S. 78 [107 S.Ct. 2254, 96 L.Ed.2d 64] (1987)." Under this standard, inmates' rights may be impinged upon to the extent that a regulation " 'is reasonably related to legitimate penological interests.' " *Id.*, quoting *Turner* at 89, 107 S.Ct. at 2261.

■ Finally, an unpublished opinion of the Sixth Circuit held that "[t]he Rehabilitation Act of 1973 ... does not apply to involuntary incarceration" (*Scudder v. Smith*, No. 92–4127, 1993 WL 262514 at *2 (6th Cir. July 8, 1993)). That decision is not binding on this court. An unpublished opinion "has no precedential value [and] cannot be given any weight in this case." *Manufacturers' Indus. Relations Ass'n v. East Akron Casting Co.*, 58 F.3d 204, 208 (6th Cir.1995). In any event, the Sixth Circuit's unpublished opinions on this issue differ. *Cf. Baker v. Seabold*, No. 87–5486, 1987 WL 38691 at *1 (6th Cir. Oct. 15, 1987), citing to *Journey*, 685 F.2d 239 (holding that plaintiff prisoner may have a justiciable claim under the Rehabilitation Act if he is part of a program receiving federal financial assistance). Consequently, I treat this issue as an open question in the Sixth Circuit.

### b. *Title II of the ADA*

■ The ADA was enacted in order to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). By its terms, Title II of the ADA applies to state corrections institutions. The Act's language is broad and contains no specific exception for prisoners. Title II defines the types of "public entity" to which it applies to be "*any* state or local government," and further specifies that this term includes "*any* department, agency ... or other instrumentality of a State ... or local government ..." 42 U.S.C. § 12131(1) (emphasis added). In stating that it bars "discrimination by *any* such [public] entity," the Act again uses the broadest possible language, without qualifications. 42 U.S.C. § 12132 (emphasis added).

■ The ADA also specifically excepts certain groups—though not prisoners—from its wide application, thus raising the inference that the incarcerated are meant to come within the Act's protection. Where "[e]xceptions to [a statute's] sweeping language are carefully enumerated ... [t]he express enumeration indicates that other exceptions should not be implied." *In re Gerwer*, 898 F.2d 730, 732 (9th Cir.1990). The ADA provides, for example, that a current user of illegal drugs is not, on the basis of such use, an "individual with a disability." 42 U.S.C. § 12210(a). Other groups are also excepted; accordingly, one finds that a section of Title IV has the unexpected heading, "Transvestites." 42 U.S.C. § 12208. Attempting to demonstrate that "any," as used in "any department," in fact means "any" is like attempting to prove a negative. Yet the presence of such specifically named exclusions strengthens the conclusion that all other groups are meant to be included. Since Congress obviously considered whether transvestites were or were not to be considered disabled, no reason exists to believe it simply overlooked the presumably far larger prisoner population. Consequently, I read the plain language of Title II as unambiguously applying to all divisions of state government.

In addition, numerous independent bases exist for the conclusion that prisoners may bring suit under the ADA. One is the Act's legislative history, which reflects Congress's intent to protect *all* the disabled—prisoners included—from discrimination. As an exam-

ple of why the training of public employees may be necessary to comply with the statute's mandate, the House Report discussed how epileptics are "frequently inappropriately arrested and jailed because police officers have not received proper training in the recognition of and aid for seizures. Often, after being arrested, they are deprived of medications while in jail, resulting in further seizures. Such discriminatory treatment based on disability can be avoided by proper training." 1990 U.S.Code Cong. and Adm.News, p. 473. This passage, while not dispositive, certainly suggests Congressional intent that prison staffs comply with the ADA in their treatment of the incarcerated.

More significantly, Congress specifically directed that the regulations pertaining to the Rehabilitation Act were to be incorporated into the ADA, providing as follows:

> Except as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. 790 et seq.) or regulations issued by Federal agencies pursuant to such title.

42 U.S.C. § 12201(a). " 'It is always appropriate to assume that our elected representatives, like other citizens, know the law.' " *Traynor v. Turnage,* 485 U.S. 535, 546, 108 S.Ct. 1372, 1380, 99 L.Ed.2d 618 (1988) (citation omitted) (holding that Congress, in enacting veteran's benefit statute using term "willful misconduct," is presumed to be aware of prior Veterans' Administration interpretation of the term). As discussed above, regulations promulgated under the Rehabilitation Act make clear that Act's applicability to a "department of corrections." 28 C.F.R. § 42.540(h). Accordingly, regulations holding that the Rehabilitation Act applies to corrections institutions apply equally to the ADA.

The regulations subsequently promulgated pursuant to the ADA are consistent with those under the Rehabilitation Act. The DOJ was specifically delegated authority to promulgate regulations under the ADA. 42 U.S.C. § 12134(a). These regulations provide that "[a]ll programs, services, and regulatory activities relating to law enforcement,

public safety, and the administration of justice, including courts and *correctional institutions ...* " are subject to the ADA. 28 C.F.R. § 35.190(b)(6) (1995) (emphasis added). The Appendix to this section explains that public entities must provide attendant care "in special circumstances, such as where the individual is an inmate of a custodial or *correctional institution.*" 28 C.F.R., Part 35, Appendix A, at 460–61 (1995) (emphasis added).

 Finally, because the ADA was enacted against a legal background holding that the essentially similar Rehabilitation Act applied to prisons, Congress can be presumed to have been in accordance with this interpretation. At the time of the ADA's enactment, July 26, 1990, all federal courts that had considered the issue held that the Rehabilitation Act applied to state prisons. *See Bonner v. Lewis,* 857 F.2d 559, 562 (9th Cir.1988); *Journey v. Vitek,* 685 F.2d 239, 242 (8th Cir.1982); *Sites v. McKenzie,* 423 F.Supp. 1190, 1197 (N.D.W.Va.1976). Congress is presumed to be aware of existing legal precedent and to take it into consideration when it enacts legislation. *Cannon v. University of Chicago,* 441 U.S. 677, 696–97, 99 S.Ct. 1946, 1957–58, 60 L.Ed.2d 560 (1979). Accordingly, if Congress were in disagreement with this interpretation of the Rehabilitation Act, it undoubtedly would have expressly excluded prisoners from the protection of a subsequent statute barring discrimination against the disabled.

It is noted that the majority of courts confronted with suits under the ADA brought by inmates have allowed them to go forward, with or without explicit analysis of the Act's application to prisons. *See Duffy v. Riveland,* 98 F.3d 447, 455 (9th Cir.1996) (holding, due to the "close relationship" between the Rehabilitation Act and the ADA, that plaintiff prisoner is a "qualified person" under the ADA); *Niece v. Fitzner,* 941 F.Supp. 1497, 1511 (E.D.Mich.1996) (holding that the ADA applies to state prisons); *Bullock v. Gomez,* 929 F.Supp. 1299, 1302 (C.D.Ca.1996) (same); *Armstrong v. Wilson,* 942 F.Supp. 1252, 1258 (N.D.Cal.1996) (same); *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1037 (S.D.N.Y.1995) (holding that Title

II of the ADA applies to state prisons, and granting summary judgment to plaintiff class on claims under the ADA); *Rewolinski v. Morgan*, 896 F.Supp. 879, 881 (E.D.Wis.1995) (holding that prisoner's complaint sets forth an arguable claim under Title II of the ADA); *Love v. McBride*, 896 F.Supp. 808 (N.D.Ind.1995) (granting prisoner's motion for new trial on the issue of damages for a violation of the ADA); *Candelaria v. Coughlin*, 1994 WL 119146 at *6 n. 2 (S.D.N.Y. April 4, 1994) (stating in *dicta* that inmate had a potentially legitimate claim under the ADA); *Noland v. Wheatley*, 835 F.Supp. 476 (N.D.Ind.1993) (holding that prisoner had adequately stated a discrimination claim under the ADA); *Outlaw v. City of Dothan, Ala.*, No. CV–92–A–1219–S, 1993 WL 735802, at *4 (M.D.Ala. April 27, 1993) (holding that prison facilities "constitute a service, program or activity ... to which the ADA applies"). *Cf. Barber v. Guay*, 910 F.Supp. 790, 802 (D.Me. 1995) (holding that arrestee's claim states a valid cause of action under the ADA).

The leading case questioning the ADA's applicability to state prisons is *Torcasio*, 57 F.3d 1340 (discussed *supra* in relation to its holding regarding the Rehabilitation Act). Although acknowledging the wide scope of Title II's language, *Torcasio* holds that the statute's relevance to prisons is not "clearly established" because other portions of the statute use language entirely incompatible with prison conditions. The court found section 12132's reference to "services, programs, or activities" particularly telling. *Id.* at 1347. It reasoned that "[a] prisoner is not normally thought of as one who would have occasion to 'meet[ ] the essential eligibility requirements' for receipt of or participation in the services, programs, or activities of a public entity. The terms 'eligible' and 'participate' imply voluntariness on the part of an applicant who seeks a benefit from the state; they do not bring to mind prisoners who are being held against their will." *Id.* Accordingly, the court concluded, the statute could not have been drafted with prisoners in mind, and its broad language should not be read to include this group within its sweep.

Contrary to this assertion, the words "eligible" and "participate" do, in their common usages, clearly apply to prisons. Language from a Ninth Circuit decision serves as an example: "as a prison inmate, [plaintiff] is qualified (sometimes required) to *participate* in activities such as disciplinary proceedings, Honor Dorm Review Committee hearings, counseling, rehabilitation, medical services, and other prison *activities*." *Bonner v. Lewis*, 857 F.2d 559, 563 (9th Cir.1988) (emphasis added). As this passage demonstrates, no semantic torture is required when using these words to describe routine prison events.

*Torcasio* further holds that Congress failed, when enacting the ADA, to emphatically announce its intention to "upset the usual constitutional balance of federal and state powers ..." *Torcasio*, 57 F.3d at 1344, quoting *Gregory v. Ashcroft*, 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). The court held, therefore, that the Act's application to state prisons must be questioned.

This rationale is also unfounded. There is no room for doubt that Congress specifically intended to alter the federal-state balance in enacting the ADA. Section 12101(b)(4) of the ADA specifically invokes the Fourteenth Amendment as a basis for the legislation. 42 U.S.C. § 12101(b)(4). Additionally, Congress expressly abrogated the States' Eleventh Amendment immunity under the ADA. *See* 42 U.S.C. § 12202. Accordingly, it is apparent that Congress intended to alter the usual federal-state balance when enacting this Act.

The Seventh Circuit has also questioned, in *dicta*, the wisdom of applying the ADA in the prison context, stating that "[i]t is very far from clear that prisoners should be considered qualified individual[s] within the meaning of the Act." *Bryant v. Madigan*, 84 F.3d 246, 248 (7th Cir.1996) (Posner, J.). Although the court acknowledged that "[t]here is no express exclusion [from the definition of 'public entity'] of jails and prisons," it detailed what it saw as potential difficulties in applying the Act to prisons, and noted that "[a]n exception to the [ADA] for prisoners, though not express, may have textual foundation in the term 'qualified individual.'" *Id.* at 248–49. However, in my judgment, where statutory language is unambiguous such concerns are best left to Congress.

*Crawford v. Indiana Dep't of Correction,* 937 F.Supp. 785, 791 (N.D.Ind.1996) (discussed *supra* in connection with its holding regarding the Rehabilitation Act) concludes that the ADA does not apply to prisons, reasoning that prisoners should not be extended statutory rights reviewed under more rigid standards than are their constitutional rights. As noted previously, the Ninth Circuit has held that prisoners' Rehabilitation Act rights are subject to limitation by " 'legitimate penological interests.' " *Gates,* 39 F.3d at 1447, quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987). This standard surely also makes sense in the ADA context.

## 2. *Availability of Qualified Immunity*

Two distinct theories have been put forward in this matter as to why defendants are entitled to qualified immunity from suit under the Rehabilitation Act and the ADA. First, the R & R *sua sponte* raised the issue of whether it was "clearly established" at the time of plaintiff's incarceration in the Kalamazoo County Jail that these Acts applied to state prisons. The magistrate judge concluded that the case law supporting such applicability was uncertain at best, and recommended that defendants be held entitled to qualified immunity on these statutory claims. Second, defendants raised a defense of qualified immunity in their motion to dismiss which conceded the applicability of both Acts but asserted that defendants had made a good-faith attempt to comply with them. The R & R did not reach this contention, having already concluded that qualified immunity was appropriate on the above basis. I will address both of these potential bases for qualified immunity in turn.

■■ I conclude that defendants are not entitled to qualified immunity on the ground that it was not "clearly established" that the Rehabilitation Act and the ADA apply to prisons. Qualified immunity is not available where an official violates "clearly established statutory ... rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). As discussed above, the explicit language of both the Rehabilitation Act and Title II of the ADA applies to state prisons. Moreover, federal regulations promulgated pursuant to both Acts made clear their applicability to corrections institutions at the time of plaintiff's incarceration.

■■ Defendants claim entitlement to qualified immunity based on their alleged good-faith attempts to comply with the Rehabilitation Act and the ADA in their treatment of plaintiff. Defendants concede for purposes of their summary judgment motion that plaintiff is a qualified individual with a disability, but advance two essentially factual contentions as to why his claims should fail. First, they claim that plaintiff was more than reasonably accommodated while incarcerated. Defendants assert that they responded fully to plaintiff's special needs by placing him in a larger cell and by giving him a special commode and bed, 24-hour access to the shower, and a shower chair. Defendants argue that this care is sufficient to meet the standard of *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). There, the Court held that "if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Id.* at 341, 106 S.Ct. at 1096. Given the knowledge that they then possessed, defendants assert, a reasonable officer could have believed that the actions taken by defendants did not violate plaintiff's statutory rights. Second, defendants allege that plaintiff did not complain about his accommodations while in the Kalamazoo County Jail. As a result, they assert, they cannot be held responsible in hindsight for needs unknown to them at the time.

Plaintiff has put forward evidence that contradicts defendants' factual contentions. In his affidavit, he states that the design of the cell's shower was largely inaccessible to him, and disputes defendants' claim that he was provided with a shower chair. He states that he had severe difficulty in using the toilet due to its seatless design and narrowly-spaced surrounding walls, and that he fell onto the floor or into the toilet bowl as a result. Contrary to defendants' assertion, he states that no portable commode was provided to him. The affidavit of a fellow inmate

filed in support of plaintiff's motion states that plaintiff complained to the jail staff numerous times regarding these problems.

As discussed above, it is not the court's responsibility to weigh the truth or falsity of either side's account at this point in the proceedings. Because plaintiff has provided some evidence in support of his statutory claims, the court must deny defendants' motion for summary judgment as to these claims.

### E. Claims for Injunctive Relief

Because plaintiff has not objected to the magistrate judge's recommendation that plaintiff's claims for injunctive relief are moot, all objections are considered waived. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b). In any event, the R & R correctly notes that where a prisoner who seeks injunctive relief with respect to prison conditions has been discharged or transferred and is no longer subject to the challenged conditions, the action should be dismissed as moot. *Abdur-Rahman v. Michigan Dep't of Corrections,* 65 F.3d 489, 491 (6th Cir.1995) (prisoner's request for injunctive relief moot where prisoner transferred from relevant prison); *Lavado v. Keohane,* 992 F.2d 601 (6th Cir.1993) (request for injunction mooted when inmate released from prison). Plaintiff's request for injunctive relief is therefore dismissed as moot.

### III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment as to plaintiff's Fourteenth Amendment claim is GRANTED as to defendants Edmonds and Kalamazoo County, and DENIED as to defendants Carter and Waligursky. Defendants' motion for summary judgment as to plaintiff's claims under the Rehabilitation Act and Title II of the ADA is DENIED. Plaintiff's claim for injunctive relief is DISMISSED.